UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

JAVIER JIMENEZ,

          Plaintiff,  **DEFENDANT'S LOCAL**
                **CIVIL RULE 56.1**
      -against-     **STATEMENT OF**
                **UNDISPUTED FACTS**

THE CITY OF NEW YORK,

              06-CV-15255 (CM)
          Defendant.

------------------------------------------------------------------------ x

    Defendant City of New York ("Defendant") by its attorney, Michael A. Cardozo,

Corporation Counsel of the City of New York, respectfully submits, pursuant to Rule 56.1 of the

Local Civil Rules of the United States District Court for the Eastern District of New York, that

the following facts are undisputed:

    1.   Plaintiff, Javier Jimenez ("plaintiff"), an employee of the New York City

Department of Housing Preservation and Development("HPD"), brings this action pursuant to

Title VII of the Civil Rights Act, 42 U.S.C. 2000-e, et seq. ("Title VII"), 42 U.S.C. § 1981, the

Age Discrimination in Employment Act, 29 U.S.C.A. §§ 628 and 634 and the Administrative

Code of the City of New York alleging that defendant discriminated against him on the basis of

his race, age, national origin, and retaliated against him and subjected him to a hostile work

environment.  See the Summons and Complaint in this action, a copy of which is annexed to the

Declaration of Assistant Corporation Counsel Andrez Carberry, dated September 19, 2008

("Carberry Decl.") as Exhibit A.[1]

**A.** ―――――――――――――――――

―――――――――――――――――

[1] Unless otherwise noted, all references to Exhibits are to those Exhibits annexed to the
Declaration of Assistant Corporation Counsel Andrez Carberry, dated September 19, 2008
("Carberry Decl.").

**A.      Plaintiff's Employment with the New York City Department of Housing Preservation and Development.**

2.      Plaintiff testified that he began his employment with HPD in 1992 after successfully taking and passing a civil service examination.   See Excerpts from plaintiff's deposition, annexed to the Carberry Decl., as Exhibit "B," at pp. 19.

3.      While employed with HPD, plaintiff has held the titles of Deputy Director of Special Projects, Director of the Weatherization Program, Deputy Director of the 7A Program and is currently employed as the Deputy Director of Contracts.  Id. at p. 19:1-19; see also A copy of plaintiff's resume, annexed to the Carberry Decl. as Exhibit "C."   In plaintiff's current position, amongst other duties and responsibilities, he assists in the management of forty-two contracts between HPD and community groups throughout the City that assist in providing housing services to New York City residents and oversees the Greenpoint/Williamsburg initiative, which seeks to help tenants in danger of being displaced because of extensive development in those neighborhoods.  See Exhibit B at p. 34:10 – p. 35:17.

4.      Plaintiff asserts that from 2003 through 2006, he applied for thirty-seven promotions and/or vacancies and was denied all those positions because of a discriminatory animus on the part of the respective decision makers based on his race, age, national origin and in retaliation for his complaint of discrimination.  See e.g. Exhibit A at ¶¶ 11-40.

5.      On or about May 11, 2006 plaintiff filed a Complaint of Discrimination with the United States Employment and Equal Opportunity Commission ("EEOC"), Charge No. 520-2006-01954 asserting that he had not been selected for the positions of Assistant Commissioner in the Division of Anti-Abandonment, and the position of Director of Planning and Administration in the Division of Anti-Abandonment, as well as twenty additional unidentified positions from 2004 to 2006 on the basis of his national origin, race and age.  See A copy of the

EEOC Complaint filed by plaintiff dated, May 11, 2006, annexed to the Carberry Decl. as Exhibit "D."

6.      On or about September 27, 2006, the EEOC mailed plaintiff a Dismissal and Notice of Rights after investigation concluding that "the evidence provided does not support your [plaintiff] allegations that you were discriminated against based on your age, race and national origin." <u>See</u> A copy of the Dismissal and Notice of Rights, dated September 27, 2006, annexed to the Carberry Decl. as Exhibit "E."

7.      On or about December 16, 2006, plaintiff commenced the instant action alleging that the defendant discriminated against him on the basis of his race, age, national origin, retaliated against him and subjected him to a hostile work environment. <u>See</u> Exhibit "A."

**B.     Positions For Which Plaintiff Alleges That He Applied And Defendant's Selection Process.**

8.      In or about December, 2003 there was vacancy at HPD for the position of Director of Staffing Management at HPD, for which a vacancy notice was prepared and distributed citywide.  <u>See</u> Declaration of Bernard Schwarz in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Schwarz Decl."), at ¶ 2, annexed to the Carberry Decl.; <u>see</u> <u>also</u> A copy of the Job Vacancy Notice bearing Transmittal Number 806-04-038, annexed to the Carberry Decl. as Exhibit "F."  The posted salary range for this position was from $65,000 to $72,000 per annum.  <u>Id.</u>

9.      The successful candidate for the above position would supervise all aspects of human resources for three large areas of HPD, the Central Liaison Unit, Data Entry Unit, Verification Unit and the Special Employment Programs which also included the WEP Program. <u>Id.</u>  In light of the scope of this position, the successful candidate would need several years of experience in human resources administration, possess strong supervisory skills, knowledge of

varying human resources programs, strong communication skills and be able to seamlessly integrate into the new position.  <u>See</u> Schwarz Decl. at ¶ 3.

10.     In accordance with Deputy Commissioner Schwarz's general practice, he reviewed all the resumes submitted for the position of Director or Staffing Management and selected the most experienced and best candidate for the position which was Ms. Karin Allen. <u>See</u> Schwarz Decl. at ¶ 4.

11.     Deputy Commissioner Schwarz determined that Ms. Allen was the best candidate for the job because she had she had over fifteen (15) years of experience in personnel and staff management, and at the time served as the Assistant Director reporting directly to the Director of Staffing Management.  <u>See</u> Schwarz Decl. at ¶ 5.  In addition, Deputy Commissioner Schwarz noted that Ms. Allen had worked directly with him for several years and was an outstanding employee, with superb technical knowledge of human resources and staffing matters including the New York Civil Service Laws, she communicated well with her staff and had developed a very good professional reputation within HPD.  <u>See</u> Schwarz Decl. at ¶ 5.

12.     Deputy Commissioner Schwarz further noted that in contrast, although he has no specific recollection of receiving or reviewing plaintiff's application for the position of Director of Staffing Management, after reviewing a copy plaintiff's resume it is devoid of any substantial Human Resource or Staff Management experience, and reflected no substantive experience with the civil service laws or other personnel rules and regulations.  <u>See</u> Schwarz Decl. at ¶ 6; <u>see also</u> A copy of plaintiff's resume, annexed to the Carberry Decl., as Exhibit "C."

13.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Deputy Commissioner Schwarz's decision making

process.   See Schwarz Decl. at ¶ 7.   As Deputy Commissioner Schwarz explained, he is currently 60 years old and upon information and belief, Ms. Allen is also over forty years old.

14.     Posting Number 806-04-078

15.     In or about March, 2004, due to a regulatory change, there were significant increases in the responsibilities then placed upon the already existing position of Director of Operations for the Housing Education Services Unit, thus there was a need to reevaluate the compensation level and required qualifications for the position.[2]   Accordingly, a vacancy notice was prepared and distributed citywide for the position of Director of Operations for the Housing Education Services Unit.   See Declaration of Karen Booker in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Booker Decl."), at ¶ 2, annexed to the Carberry Decl.; see also A copy of the Job Vacancy Notice bearing Transmittal Number 806-04-078, annexed to the Carberry Decl. as Exhibit "G."   The posted salary range for this position was from $45,312 to $70,549 per annum.   Id.

16.     The successful candidate for the above position would oversee all activities related to the Unit's Lead Component with regard to personnel, budgetary, purchasing and facilities management functions.   Id.   In addition, the candidate would serve as the Unit's database administrator for the Lead Component, which included all the mandatory reporting, maintaining a comprehensive database, issuing and maintaining copies of certificates for 8,000 to 24,000 students per year, while supervising approximately fifty-six employees. Id.

17.     The successful candidate also would be a person with very good overall administration skills, have significant experience running an entire Division, have working

**A.**     ────────────────────

[2] Prior to the regulatory change, Ms. Karen Mayo served as Director of Operations for the Housing Services Unit.

knowledge of all the personnel regulations, and a very strong knowledge of procurement and budgetary matters.  See Booker Decl. at ¶ 4.

18.     In accordance with Ms. Booker's general practice, she reviewed all the resumes submitted for the position of Director of Operations for the Housing Education Services Unit and assembled an interview committee consisting of herself, Ms. Betty Wilson and Ms. Cassandra Vernon, who provided input and made recommendations to Ms. Booker.  See Booker Decl. at ¶ 5.  After the resumes were sorted Mr. Javier Jimenez and Ms. Karen Mayo were amongst the candidates Ms. Booker selected for an interview.  Id.  Thereafter, Ms. Booker determined that Ms. Mayo should be selected for the position. Id.

19.     Ms. Booker noted that Ms. Mayo was the best candidate for the position because she had a superb history in the agency as a Director of Administration for several large property management units, each with staff of over one hundred (100) people or more and contract staff of over three hundred (300) people, and was responsible for the budget of each unit which amassed at times approximately $10M, and had already served a the Director of Administration in this Unit as of 2001.  Id. at ¶ 6; see also A copy of Ms. Mayo's Resume which is annexed to the Carberry Decl. as Exhibit "H."  Ms. Mayo was also versed in the daily operation of the division and was previously instrumental in the revamping of the unit, therefore, she was the best suited to oversee the unit, including the hiring of an additional thirty (30) staff members to get the program functional in real time, as required by then newly passed regulation.  See Booker Decl. at ¶ 6.

20.     In contrast, plaintiff did not have the experience in budgeting, nor any extensive computer knowledge and had skills more suitable to being a trainer or a person who could assist

in writing a curriculum but not as a Director.  Id. at ¶ 7; see also A copy of plaintiff's resume, annexed to the Carberry Decl., as Exhibit "C."

21.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Ms. Booker's decision making.  In fact, Ms. Booker is an African American and was forty-seven years old at the time of her decision to hire Ms. Mayo who upon information and belief is also an African American woman over the age of forty.  See Booker Decl. at ¶¶ 8-9.

22.     In or about March, 2004, there was a vacancy for the position of Deputy Director of the LEAD COTA Squad, for which a vacancy notice was prepared and distributed citywide. See Declaration of Rassoul Azarnejad in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Azarnejad Decl."), at ¶ 3, annexed to the Carberry Decl; see also Job Vacancy Notice bearing Transmittal Number 806-04-090, a copy of which annexed to the Carberry Decl. as Exhibit "I."  The posted salary range for this position was from $45, 312 to $70,549 per annum.  Id.

23.     The position of Deputy Director of the LEAD COTA Squad was code enforcement intensive as it was commissioned by the then newly passed Local Law 1 regulation which required the hiring of several individuals for the LEAD program with experience in code enforcement.  See Azarnejad Decl. at ¶ 4.  The successful candidate for the above position would oversee the management activities of nine to ten inspectors, and clerical staff, in creating and implementing the procedures outlined in the HPD rules and the Childhood Lead Poisoning Prevention Act of 2004, and monitor appropriate responses to the Commissioner's Orders to Abate lead paint hazards by the Department of Health.  Id.; see also Exhibit "I."  The successful

candidate would also oversee the tracking and communication with the building owners, and issue summonses where necessary.  See Azarnejad Decl. at ¶ 4.

24.     In accordance with his general practice, Mr. Azarnejad reviewed all the resumes submitted for the position of Deputy Director of the LEAD COTA Squad and selected candidates for interview with experiences in Code enforcement, especially those with LEAD experience. See Azarnejad Decl. at ¶ 5.  Thereafter, Assistant Commissioner Jose Torres and Mr. Azarnejad interviewed the candidates that he had selected to be interviewed and at the end of that process, Mr. Azarnejad selected the most qualified candidate, who he thought could step into the position and immediately begin the process of implementing a comprehensive inspection unit, which was Mr. Michael Murphy.  Id.

25.     Mr. Murphy he had extensive experience in the field, having worked in the asbestos program with me and as the former Deputy Director of Emergency Repair Program and the Deputy Director of the demolition program which both required work involving asbestos and code enforcement.  See Azarnejad Decl. at ¶ 6.  In addition, Mr. Murphy had the requisite federal Lead Inspector certification coupled with years of lead inspection and environmental knowledge. Id.

26.     In contrast, although Mr. Azarnejad has no specific recollection of receiving or reviewing plaintiff's application for the position of Director of the LEAD COTA Squad, upon review, plaintiff's resume was devoid of any experience in code enforcement or with lead inspections, and did not indicate he possessed the requisite Lead Inspection Certification.  Id. at ¶ 7.  Therefore, plaintiff was not a suitable candidate and was not interviewed for the position.  Id.; see also A copy of plaintiff's resume, annexed to the Carberry Decl., as Exhibit "C."

27.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Mr. Azarnejad's decision making.  In fact, Mr. Azarnejad was forty-nine years old and I am of Iranian national origin when he made the decision to select Mr. Murphy, who upon information and belief is over the age of forty.  See Azarnejad Decl. at ¶ 8; see also Mustaciuolo Decl. at ¶ 7.  In addition, Mr. Murphy is also over the age of forty.  Id.

28.     In or about March, 2004, due to new regulation, there was a vacancy for the position of a J-51 Lead Coordinator for the Tax Incentive Programs ("TIP"), for which a vacancy notice was prepared and distributed citywide.  See Declaration of Lisa Yee in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Yee Decl.") at ¶ 2, annexed to the Carberry Decl.; see also Job Vacancy Notice bearing Transmittal Number 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, annexed to the Carberry Decl. as Exhibit "J."  The posted salary range for this position was from $50, 847 to $70,549 per annum.  Id.

29.     The successful candidate for the above position would be responsible for creating the forms and processes that would be required and added to the already functioning J-51 program.  Id.; see also Yee Decl. at ¶ 3. The successful candidate would assist with other programs in TIP, but would spend considerable time implementing the New York City Council's lead paint abatement law dealing with the repair of dwellings in the City, which were authorized under the program, and train and supervise staff in the new procedures.  See Yee Decl. at ¶ 3. Accordingly, the successful candidate would have to be an excellent communicator, and would also need to possess the necessary experience to translate the requirements of the law into operational procedures.  Id.

30.     All applicants for the position of J-51 Lead Coordinator for the TIP , all applications were submitted to the division of human resources representative Yonatan Jacobs,

who had assisted in drafting the posting for the position and was familiar with the job requirements and skills Ms. Yee sought in a potential candidate. Id. at ¶ 4. After screening the initial applicants, Mr. Jacobs then forwarded a list of candidates whom Ms. Yee interviewed and selected the best candidate for the position which was Ms. Elizabeth Zeldin. Id. at ¶ 5.

31.     Ms. Zeldin was the best candidate for the job because she had extensive writing and analytical experience, having worked with the New York City Independent Budget Office for three years and having worked on a number of reports which were issued by that entity, an entity whose work and reports Ms. Yee was familiar with and therefore was aware of the quality of their work. See Yee Decl. at ¶ 6; see also A copy of Ms. Zeldin's Resume which is annexed to the Carberry Decl. as Exhibit "K." Ms. Zeldin also had worked internationally on municipal finance and was a "SAT" instructor and a project coordinator who had acquired a Masters in Economics. See Yee Decl. at ¶ 6. It was clear from Ms. Zeldin's resume and at her interview, that she was a very interesting person, who would able to quickly assess the needs of the agency and the program, in order to implement the program by drawing from all her prior experience. Id.

32.     Ms. Yee explained that although she had no specific recollection of receiving or reviewing plaintiff's application for the position, after reviewing a copy plaintiff's resume it does not reflect that he had superior writing experience, which was an essential component of the job. Id. at ¶ 7; see also A copy of plaintiff's resume, annexed to the Carberry Decl., as Exhibit "C."

33.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Ms. Yee's decision making. See Yee Decl. at ¶ 8. In fact, Ms. Yee was 52 years old and of Chinese national origin when she made the decision to hire Ms. Zeldin. Id.

34.     In or about April, 2004, there was a vacancy for the newly created position of Special Assistant to the Chief of Staff for which a vacancy notice was prepared and distributed citywide.  <u>See</u> Declaration of Laurel Blatchford in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Blatchford Decl.") at ¶ 2, annexed to the Carberry Decl.; <u>see</u> <u>also</u> A copy of the Job Vacancy Notice bearing Transmittal Number 806-04-115, annexed to the Carberry Decl. as Exhibit "L."  The posted salary range for this position was from $44, 83 to $53,684 per annum.  <u>Id.</u>

35.     The successful candidate for the above position would amongst other duties as assigned, be responsible for researching and writing memos, speeches and testimony for the Commissioner/Chief of Staff, assisting the Chief of Staff on priority projects, including the implementation of the Mayor's New Marketplace Housing Plan, reviewing and responding to intra-divisional and interagency issues that are of immediate concern to the agency and preparing responses to correspondence involving various divisions within the agency.  <u>Id.</u>

36.     HPD Chief of Staff Blatchford also sought an individual who had experience working with high level agency executives and politicians in varying branches of City government and sister agencies.  <u>See</u> Blatchford Decl. at ¶ 4.

37.     In accordance with Ms. Blatchford's general practice, she reviewed all resumes submitted for the position of Special Assistant to the Chief of Staff and interviewed the candidates she believed after a review of their respective resumes, had the most applicable skills and experience.  <u>Id.</u> at ¶ 5. After a review of the resumes and interview of qualified candidates, Ms. Blatchford selected the most experienced and best-suited candidate for the position of Special Assistant to the Chief of Staff, Ms. Katherine McCracken.  <u>Id.</u>

38.     Ms. McCracken was the best candidate for the position because she brought to the position significant experience as a Press Secretary in varying governmental capacities, and was an individual who had a very good understanding of what the other City agencies were doing and inter-agency dynamics, including the varying policy makers at City Hall.  Id. at ¶ 6; see also A copy of Ms. McCracken's Resume, annexed to the Carberry Decl. as Exhibit "M."  Moreover, Ms. McCracken is also an excellent writer, and was a well regarded employee at the Department of City Planning.  See Blatchford Decl. at ¶ 6.

39.     In contrast, Ms. Blatchford explained that although she does not have a specific recollection of receiving or reviewing plaintiff's application for this position, upon review of plaintiff's resume, he does not possess the level and extent of writing experience and correspondence with high level government officials that Ms. Blatchford sought for this position. Id. at ¶ 7; see also Exhibit "C."  In addition, plaintiff's experience, while admirable was more programming and operational in nature, and did not reflect the level of exposure to policy making or political sensitivity Ms. Blatchford sought in the successful candidate.  See Blatchford Decl. at ¶ 7.

40.     Moreover, Ms. Blatchford noted that at no time in the selection process, did race, national origin or age of the prospective candidates play any role in her decision making process. Id. at ¶ 8.

41.     In or about June, 2004, there was a reassessment of the duties and responsibilities for the position of Director of Operations for the Housing Education Services Program and Lead Education Program ("HESLEP"), accordingly, a vacancy notice was prepared and distributed citywide.[3]  See Declaration of Luiz Aragon in Support of Defendant's Motion for Summary

**A.**   _____

[3] Ms. Karen Booker was the incumbent Director of Operations for HESLEP.

Judgment, dated September 19, 2008 ("Aragon Decl.") at ¶ 2, annexed to the Carberry Decl.; <u>see</u> <u>also</u> Job Vacancy Notice bearing Transmittal Number 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, annexed to the Carberry Decl. as Exhibit "N."  The posted salary range for this position was from $78,000 to $98,000 per annum.  <u>Id.</u>

42.     The successful candidate for the above position would be responsible for designing educational programs to ensure the proper repair and management of city-owned and privately-owned properties in compliance with the Housing Maintenance Code, Local Law #1 of 2004, and all other local, state, and federal real property and environmental health mandates.  <u>Id.</u> The selected candidate would also oversee the recruitment, training, assignment and management of all HESLEP staff and represent HPD in meetings with other government agencies and with public and private institutions and groups.  <u>Id.</u>

43.     In accordance with Deputy Commissioner Aragon's general practice, his personnel division collected all the resumes of the applicants and reviewed them to ensure that the applicants met the basic credentials as detailed in the aforementioned posting.  <u>See</u> Aragon Decl. at ¶ 4.  The resumes of the qualified candidates were forwarded then forwarded to Deputy Commissioner Aragon for review, who then interviewed and selected the incumbent Ms. Karen Booker for the position of Director of Operations for HESLEP.  <u>Id.</u>

44.     Ms. Booker was the best candidate for the position of Director of Operations for HESLEP because she had been successfully performing the duties and responsibilities of the position since 2001, and had extensive experience in the Operations unit since 1994.  <u>See</u> A copy of Ms. Booker's resume which is annexed to the Carberry Decl. as Exhibit "O;" <u>see</u> <u>also</u> Aragon Decl. at ¶ 5.  In addition in her capacity as Director of Operations for HESLEP, Deputy Commissioner Aragon had the opportunity to supervise Ms. Booker and knew that her

knowledge and skills designing educational programs to ensure the proper repair and management of city-owned and privately-owned properties in compliance with city, state and federal law to be superb.  Id.  She also was an excellent supervisor.  Id.

45.     Although Deputy Commissioner Aragon, does not have a specific recollection of receiving or reviewing an application for plaintiff for this position, upon review of plaintiff's resume, Deputy Commissioner Aragon noted that, it was apparent that plaintiff has no substantive experience handling large real property dispositions, or health mandates associated with such disposition.  Furthermore, plaintiff lacked experience in Operations.  See Aragon Decl. at ¶ 6; see also A copy of plaintiff's resume, annexed to the Carberry Decl., as Exhibit "C."

46.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in the decision making process, in fact Deputy Commissioner Aragon was forty-four (44) years old and of Hispanic heritage when he made the decision to hire Ms. Booker. See Aragon Decl. at ¶ 7.

47.     In or about August, 2005, there was a vacancy for the newly created position of Administrative Project Manager M1 for which a vacancy notice was prepared and distributed citywide.  See Declaration of Rafael Cestero in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Cestero Decl.") at ¶ 2, annexed to the Carberry Decl.; see also A copy of the Job Vacancy Notice bearing Transmittal Number 806-05-015, annexed to the Carberry Decl. as Exhibit "P."  The posted salary range for this position was from $65,000 to $75,000 per annum.  Id.

48.     The successful candidate for the Administrative Project Manager M1 position would be responsible for working with varying Deputy Commissioners, Assistant Commissioners, Chief of Staff's office, and other agency offices to develop a clear picture of the

pipeline and an analysis of where the agency stood relative to the New Marketplace Plan goals. Id. The successful candidate would also assist the Deputy Commissioner and others in the development of new financing tools for meeting the Mayor's supportive housing goals and provide necessary research, modeling and financial analysis in support of this effort. See Cestero Decl. at ¶ 3. Due to the specified nature of the position, I also sought an individual who had experience working with the varying real estate financing tools and programs because a tremendous amount of the candidate's time would be spent running financial figures. Id. Due to the specified nature of the position, Deputy Commissioner Cestero also sought an individual who had experience working with the varying real estate financing tools and programs because a tremendous amount of the candidate's time would be spent running financial figures. Id.

49.     In accordance with former Deputy Commissioner Cestero's general practice, all resumes were collected and vetted by members of his staff who then made recommendations as to the candidates they believed best fit the criteria he previously laid out for the position. Id. at ¶ 4.     Thereafter, former Deputy Commissioner Cestero considered several candidates and interviewed and selected Juliet Cullen-Cheung, because she was the best candidate for the position. Id.

50.     Former Deputy Commissioner Cestero explained that Ms. Cullen-Cheung was the best candidate for the position because she had successfully spent years working in the Division of Housing Finance, in HPD performing real estate finance which was the exact experience and skill set I sought in the successful candidate. Id. at ¶ 5; see also A copy of Ms. Cullen-Cheung's Resume, annexed to the Carberry Decl. as Exhibit "Q." Moreover, Ms. Cullen-Cheung had received glowing remarks from all her superiors and was regarded as a rising star in the agency,

especially as it pertained to real estate finance and was an individual I believed could seamlessly transition into the position.  See Cestero Decl. at ¶ 5.

51.    Although former Deputy Commissioner Cestero has no specific recollection of receiving or reviewing plaintiff's application for the position, upon review of plaintiff's resume, former Deputy Commissioner Cestero found that it is apparent that he has the experience of doing the MMR indicator reports, but he has absolutely no real estate experience or investment experience, or any experience running spreadsheets on the type of analytical data this position entailed.  Id. at ¶ 6; see also Exhibit "C."

52.    At no time in the selection process, did race, national origin or age of the prospective candidates play any role in former Deputy Commissioner Cestero's decision making process.  See Cestero Decl at ¶ 7.  In fact, Mr. Cestero is Hispanic and of Puerto Rican national origin when he selected Ms. Juliet Cullen-Cheung.

53.    In or about August, 2004, there was a vacancy for the position of Assistant Commissioner of the Division of Alternative Management Programs ("DAMP") for which a vacancy notice was prepared and distributed citywide.   See Declaration of Ann Marie Hendrickson in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Hendrickson Decl."), at ¶ 2, annexed to the Carberry Decl.; see also A copy of the Job Vacancy Notice bearing Transmittal Number 806-05-021, annexed to the Carberry Decl. as Exhibit "R."  The posted salary range for this position was from $95, 000 to $112,000 per annum.  Id.

54.    The successful candidate for the position of Assistant Commissioner of DAMP would be responsible for participating in the formulation of policy for the administration of programs in the City's comprehensive neighborhood redevelopment initiative designed to spur

neighborhood growth by returning City-owned in-rem buildings to responsible private owners. See id.

55.     In addition, the successful candidate would have a background in implementing the disposition of City owned property, capable of multi-tasking effectively, be a good communicator, articulate, possess prior managerial experience, capable of working flexible hours including late nights, familiar with Federal and City polices, and prior experience working with low income housing tax credits and federal funds and other funding programs that are available to low income individuals.  See Hendrickson Decl. at ¶ 4.

56.     In accordance with Ms. Hendrickson's general practice, all resumes were collected by her human resources liaison and forwarded to her.  See Hendrickson Decl. at ¶ 5. Ms. Hendrickson then reviewed all the resumes submitted for the position of Assistant Commissioner of DAMP and interviewed the candidates who after a review of their respective resumes, had the most applicable skills and experience.  Id.  After a review of the resumes and interview of qualified candidates, Ms. Hendrickson selected the most experienced and best suited candidate for the position of Assistant Commissioner of DAMP, Mr. Wendell Walters.  Id.

57.     Mr. Walters was the best candidate for the position in part because he had been the Director of the Neighborhood Entrepreneur Program, and as such was responsible for one of the largest units in the division for approximately six years.  Id. at ¶ 6; see also A copy of Mr. Walters' Resume which is annexed to the Carberry Decl. as Exhibit "S."  Ms. Hendrickson was also very familiar with Mr. Walter's work having served as his direct supervisor, and as such was very familiar with Mr. Walter's work, having had the opportunity to observe him at work and found him to be very articulate, well versed in the various policies and disposition strategies, had excellent management background and techniques, was well respected by superiors and

subordinates, was a hard worker with a good reputation and he was capable of working flexible hours.  See Hendrickson Decl. at ¶ 6.

58.     Although Ms. Hendrickson had no specific recollection of receiving or reviewing plaintiff's application for the position, upon review of plaintiff's resume, Ms. Hendrickson explained that in her opinion, plaintiff's reflects that he was more of an analyst with little supervisory experience, while this position required a decision maker and policy shaper.  See Hendrickson Decl. at ¶ 7.   Furthermore, Furthermore, plaintiff's resume did not reflect any experience or background in disposition, nor any experience in the process of getting buildings renovated and sold to the private sector.  Id.  In addition, while plaintiff possessed admirable skills, he also had no experience running some of the larger programs in the units to which he was previously assigned.  Id.; see also Exhibit "C."

59.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Ms. Hendrickson's decision making process.  Id. at ¶ 8.  In fact, Ms. Hendrickson is 42 years old and a black woman of West Indian (Caribbean) ancestry, and Mr. Walters upon information and belief is black over the age of forty.  Id. at ¶¶ 8-9.

60.     In or about September, 2004, there was a vacancy for the position of Executive Assistant to the First Deputy Commissioner of HPD, for which a vacancy notice was prepared and distributed citywide.  See Declaration of John Warren in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Warren Decl.") at ¶ 2, annexed to the Carberry Decl.; see also A copy of the Job Vacancy Notice bearing Transmittal Number 806-05-023, annexed to the Carberry Decl. as Exhibit "T."  The posted salary range for this position was from $50,847 to $70,549 per annum.  Id.

61.    The successful candidate for position of Executive Assistant to the First Deputy Commissioner of HPD would amongst other duties, conduct research to enable First Deputy Commissioner Warren to respond to community issues, tenant inquiries, and other City agencies; prepare reports on issues involving community based programs; review intra-divisional and inter-agency issues that are of immediate concern to HPD; prepare responses to correspondence involving various divisions within HPD and represent the First Deputy Commissioner at senior level meetings.  Id.; see also Warren Decl. at ¶ 3.

62.    In addition, First Deputy Commissioner Warren noted that the successful candidate would have to be a good writer, someone who could engage in policy analysis and had an ability to work effectively with a variety of people in and out of the agency and represent First Deputy Commissioner Warren internally and with other entities including community groups and other organizations with whom HPD routinely works and capable of maintaining confidentiality.  Id. at ¶ 4.

63.    First Deputy Commissioner Warren reviewed all the resumes submitted for the position of Executive Assistant to the First Deputy Commissioner, after which he interviewed and selected the most experienced and best suited candidate for the position, Ms. Carlecia Taylor.  Id. at ¶ 5.

64.    Ms. Taylor was the best candidate for the position and uniquely qualified because she had a strong academic background, she had prior work experience with not for profit entities, she had a wide range of experience in land use and housing matters as well as valuable experience with the Brooklyn Chamber of Commerce, specifically in the area of urban and economic development.  Id. at ¶ 6; see also A copy of Ms. Taylor's resume which is annexed to the Carberry Decl. as Exhibit "U."   Furthermore, Ms. Taylor was extremely articulate, had a

good sense of the issues the agency and in particular my office was addressing, and was a strong writer who was highly recommended.  See Warren Decl. at ¶ 6.

65.     In contrast, First Deputy Commissioner Warren noted that he has no specific recollection of receiving or reviewing plaintiff's application for the position of position of Executive Assistant to the First Deputy Commissioner of HPD, however, upon review of a copy of plaintiff's resume, it was apparent that this position would have been below plaintiff's current title.  See Warren Decl. at ¶ 7; see also Exhibit "C."  Furthermore, plaintiff's resume did not speak to the extent of his experience interacting with varying internal and external entities which would be a very large component of the duties of the executive assistant.  See Warren Decl. at ¶ 7.  There is no indication from plaintiff's resume that he had experience interacting with the not-for-profits and community groups to the extent that would be required by this position.  Id.

66.     First Deputy Commissioner Warren also explained that at no point did race, age or national origin play any role in his decision not to select plaintiff for the position of Executive Assistant to the First Deputy Commissioner.  Id. at ¶ 8.

67.     In or about November, 2004, there was a modification in the duties of the position of Director of Operations for Administrative Services, and accordingly, a vacancy notice was prepared and distributed citywide.  See Aragon Decl. at ¶ 8, annexed to the Carberry Decl; see also Job Vacancy Notice bearing Transmittal Number 806-05-036, annexed to the Carberry Decl. as Exhibit "V."  The posted salary range for this position was from $80,000 to $100,000 per annum.  Id.

68.     The successful candidate for the position of Director of Operations for Administrative Services would amongst other duties, oversee and coordinate the administrative and management activities of the divisions and program units in the Office of Preservation

Services.  Id.  In such a position, the successful candidate would possess a working knowledge of varying areas of HPD because he/she would also supervise the personnel, administration and budget units and would be required to interact with employees of all those units and direct them in the appropriate procedures and goals of the varying units to conform with the overall goals of HPD.  Id.; see also Aragon Decl. at ¶ 9.  In addition, Deputy Commissioner Aragon sought a candidate with extensive personnel experience and a very good understanding of HPD units and a strong communicator.  Id.

69.     In accordance with his general practice, Deputy Commissioner Aragon's personnel division collected all the resumes of the applicants and reviewed them to ensure that they met basic minimum qualifications as detailed in the aforementioned posting.  Id. at ¶ 10. After the personnel unit completed reviewing the applicants' resumes, Deputy Commissioner Aragon reviewed the resumes of the qualified individuals, interviewed and selected Susan Carr for the position of Director of Operations for Administrative Services.  Id.

70.     Ms. Carr was the best candidate for the position of Director of Operations for Administrative Services because she had successfully served in that capacity prior to the modification of her duties in or about November 2004.  Id. at ¶ 11; see also A copy of Ms. Carr's resume which is annexed to the Carberry Decl. as Exhibit "W."  In her tenure as Director of Operations for Administrative Services, Ms. Carr had illustrated a very strong knowledge of personnel policies and procedures, budgetary and procurement practices and procedures, and was a very effective manager and communicator who Deputy Commissioner Aragon had come to rely upon for accurate and effective responses to inquires related to matters under her auspices. See Aragon Decl. at ¶ 11.  Moreover, Ms. Carr possessed extensive experience as a Special Assistant, Director and Assistant Commissioner in varying divisions within HPD since 1981.  Id.

71.     In contrast, upon review of plaintiff's resume, he had no substantive experience in personnel management, budgetary or procurement practices and therefore was not a suitable candidate for this position.  Id. at ¶ 6; see also Exhibit "C."

72.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Deputy Commissioner Aragon's decision making process, in fact, Deputy Commissioner Aragon is Hispanic and was (44) years old when he made the decision to hire Ms. Carr.  See Aragon Decl. at ¶ 12.

73.     In or about November, 2004, Mr. Mustaciuolo determined there was a need to increase the salary for the position of Director of Customer Services and Special Initiatives because of the increase in responsibilities which had been assigned to the incumbent, Mr. Richard Immediato.  Accordingly, at Mr. Mustaciuolo's request, a vacancy notice was prepared and distributed citywide.  See Mustaciuolo Decl. at ¶ 2; see also Job Vacancy Notice bearing Transmittal Number 806-05-040, a copy of which is annexed to the Carberry Decl. as Exhibit "X."  The posted salary range for this position was from $65,000 to $85,000 per annum.  Id.

74.     The successful candidate for the above position would be responsible for the coordination of several customer services and marketing activities involving Code Enforcement, oversee the Registration Assistance Unit, which provides assistance to private owners of multiple dwellings and private dwellings in New York City who are statutorily required to register their properties annually with HPD and administer the annual legal requirement to mail property registration materials to these owners, facilitate various initiatives to encourage new owners and delinquent owners to register with HPD.  Id.

75.     In accordance with Mr. Mustaciuolo's general practice, all resumes were collected and vetted by members of the division's human resources staff, Gisela Ruiz, Cindy Ramos, and

Roslyn Collins,[4] who then forwarded the qualified candidates to him for consideration.  Id. at ¶ 4.  Thereafter, Mr. Mustaciuolo interviewed and selected the most qualified candidate for the position of Director of Customer Services and Special Initiatives, Mr. Richard Immediato.  See Mustaciuolo Decl. at ¶ 4.

76.     Mr. Immediato was the best candidate for the position because he already served as a Director for varying units within the division since 1993, and was very knowledgeable as to the varying duties and responsibilities of the units the Director of Customer Services and Special Initiatives would be called upon to oversee.  See Mustaciuolo Decl. at ¶ 5; see also A copy of Mr. Immediato's resume which is annexed to the Carberry Decl. as Exhibit "Y."  Specifically, Mr. Immediato was already serving in the position of Director of the Registration Assistance Unit and the Emergency Repair Research Unit and was an employee I held in high esteem because of his professional approach to his work, his initiative and desire to improve the manner in which HPD performed its tasks.  See Mustaciuolo Decl. at ¶ 5.  Mr. Immediato also was one of the individuals who assisted in the development and implementation of HPD's database (HPD Info) and was uniquely capable of navigating the database.  Id.  Moreover, Mr. Immediato had extensive experience in registration and contracting.  Id.

77.     Although Mr. Mustaciuolo had no specific recollection of receiving or reviewing plaintiff's application for the position of Director of Customer Services and Special Initiatives, upon review of plaintiff's resume, it was apparent to Mr. Mustaciuolo that plaintiff has no experience in code enforcement, registration or marketing.  See Mustaciuolo Decl. at ¶ 6; see also Exhibit "C."

**A.** _____

[4] Ms. Ruiz and Ms. Ramos are both Hispanic.

78.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Mr. Mustaciuolo's decision making process.  See Mustaciuolo Decl. at ¶ 7.  In fact, Mr. Mustaciuolo was forty-four years old when he made the decision to hire Mr. Immediato, who upon information and belief, is also over the age of fifty. Id.

79.     In or about December, 2004, there was a vacancy for the position of Director of Third Party Transfer for which a vacancy notice was prepared and distributed citywide.  See Declaration of Aileen Gribbin in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Gribbin Decl.") at ¶ 2, annexed to the Carberry Decl.; see also A copy of the Job Vacancy Notice bearing Transmittal Number 806-05-046, annexed to the Carberry Decl. as Exhibit "Z."  The posted salary range for this position was from $47,604 to $74,118 per annum.  Id.

80.     The successful candidate for the above position would, be responsible for overseeing the prequalification process for entities eligible for designation as new owners, including drafting and issuing RFQs and evaluating the experience and qualifications of the applicants to establish qualified owners' panel.  Id.  The incumbent would also be responsible for determining program triage, developing property clusters for development, matching developers with available clusters, preparing City land use approval submissions and working to marshal agency recommendations through the New York City Council approval process required for property transfer as well as overseeing budget and work of nonprofit entity with interim title to TPT buildings, including troubleshooting and oversee the management of properties until construction loan closings and final transfers to new ownership occur.  Id.  The selected candidate would also coordinate with rehabilitation financing programs on underwriting, design,

tenant and other pre-financing issues and working with developers to ensure timely construction closings and rehab completion and prepare reports and budgets and monitor program databases. Id.

81.     In accordance with the general practice of Assistant Commissioner Gribbin, all resumes submitted for the position of TPT Director were forwarded to Ms. Susan Ponce De Leon, who interviewed the qualified candidates and made a recommendation to A.C. Gribbin that Ms. Sara Oerth be selected for the position of TPT Director.  See Gribbin Decl. at ¶ 4.

82.     Ms. Oerth was the best candidate for the position because she had experience in the Participation Loan Program (PLP), which is the primary financing source for the TPT program, and that experience was invaluable.  See Gribbin Decl. at ¶ 5.  In addition Assistant Commissioner Gribbin had known Ms. Oerth for several years as a subordinate in her division and knew Ms. Oerth to be a very hard worker, with excellent computer skills and experience. Id.; see also Resume of Sara Oerth, a copy of which is annexed to the Carberry Decl., as Exhibit "AA."

83.     Although Assistant Commissioner Gribbin has no specific recollection of receiving or reviewing plaintiff's application for this position, upon review of plaintiff's resume, she explained that plaintiff possessed no lending experience, and therefore would have required extensive training, including underwriting training, to get him up to speed on the operation of the unit at a time when I sought a candidate who could take control of the program with minimal interruption.  See Gribbin Decl., at ¶ 6; see also Exhibit "C."

84.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in my decision making process, as a matter of fact,

Assistant Commissioner Gribbin was forty-five years old when she made the decision to hire Ms. Oerth.  See Gribbin Decl. at ¶ 7.

85.     In or about March, 2005, there was a vacancy for the position of Director of the Third Party Transfer ("TPT"), for which a vacancy notice was prepared and distributed citywide. See Declaration of Robin Weinstein in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Weinstein Decl.") at ¶ 2, annexed to the Carberry Decl.; see also Job Vacancy Notice bearing Transmittal Number 806-05-132, annexed to the Carberry Decl. as Exhibit "BB."   The posted salary range for this position was from $47,604 to $74,118 per annum.  Id.

86.     The successful candidate for the above position of Director of TPT would oversee the process to qualify entities as eligible for designation as new owners, including drafting and issuing RFQs and evaluating the experience and qualifications of the applicants to establish qualified owners panels.   Id.   The selected candidate would also be responsible for recommending program triage, developing property clusters for development, matching developers with available clusters, preparing City land use approval submissions and working to marshal agency recommendations through the City Council approval process required for property transfer as well as overseeing budget and work of the nonprofit entity with interim title to TPT buildings, which includes troubleshooting and overseeing the management of properties until construction loan closings and final transfers to new ownership occur.  Id.  The selected candidate would also coordinate with HPD rehabilitation financing programs on underwriting, design, tenant and other pre-financing issues and working with developers to ensure timely construction closings and rehab completion, preparing reports, budgets and program databases. Id.

87. All the resumes submitted for the position of Director of the TPT were forwarded to Susan Ponce de Leon, because the successful candidate would report directly to her. <u>See</u> Weinstein Decl. at ¶ 4.

88. Assistant Commissioner Ponce de Leon vetted the resumes submitted for the position at which time Ms. Ponce de Leon and Ms. Weinstein interviewed candidates, culminating with the selection of Ms. Mayumi Fukushima for the position of Director of the TPT. <u>See</u> Weinstein Decl. at ¶ 5.

89. Ms. Fukushima was the best candidate for the position of Director of the TPT because in her prior position as Project Manager in a related Division, she had often interacted with the previous TPT director and other staff members in that program, and had experience with various loan programs used by TPT. <u>See</u> Weinstein Decl. at ¶ 6; <u>see also</u> A copy of Ms. Fukushima's resume which is annexed to the Carberry Decl. as Exhibit "CC." Ms. Fukushima also had a very good reputation as an employee within the Office of Development who Ms. Weinstein believed would effectively perform the duties of Director of the TPT with little supervision and endorsed Assistant Commissioner Ponce De Leon's choice. <u>See</u> Weinstein Decl. at ¶ 6.

90. Ms. Weinstein had no recollection of receiving or reviewing plaintiff's application for this position, however, upon later review of plaintiff's resume, Ms. Weinstein explained that in her opinion, plaintiff's resume reflects little or no experience working with or interacting with the elements of the TPT program handled by the Office of Development, and had far less experience working on the property disposition processes applicable to the TPT program. <u>Id.</u> at ¶ 7; <u>see also</u> Exhibit "C."

91.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in the decision making process.  See Weinstein Decl. at ¶ 9.

92.     In or about March, 2005, there was a vacancy for the newly created position of Director of Policy Analysis and Operations for which a vacancy notice was prepared and distributed citywide.  See Declaration of Timothy O'Hanlon in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("O'Hanlon Decl."), annexed to the Carberry Decl.; see also A copy of the Job Vacancy Notice bearing Transmittal Number 806-05-137, annexed to the Carberry Decl. as Exhibit "DD."  The posted salary range for this position was from $55,119 to $83,713 per annum.  Id.

93.     The successful candidate for the above position would be responsible for developing and supervising the implementation of administrative, personnel, budget, policy, and planning initiatives, provide analysis and recommendations for the implementation of new division related initiatives and evaluation and oversee the division's priority projects and work with the Assistant Commissioner and program directors to define the vision and goals that will guide the division's work.  Id.

94.     In addition Assistant Commissioner O'Hanlon sought an individual who possessed detailed knowledge of supporting housing projects developed over the last fifteen (15) years and the protocols for developing new projects.  See O'Hanlon Decl. at ¶ 4.  The successful candidate also would be responsible for the reporting and liaison functions of the division and other city, state and federal agencies.  Id.

95.     In accordance with Assistant Commissioner O'Hanlon's general practice, all resumes were collected and vetted by his staff after which he selected the most experienced and best-suited candidate for the position of Director of Operations, Mr. David Rouge.  Id. at p. 5.

96.     Mr. Rouge was the best candidate for the position because he had successfully performed the duties of that position in this division for several years and was knowledgeable as to the unique work this division does, having worked extensively with other city, state and federal agencies who provide assistance to homeless and disabled individuals.  See O'Hanlon Decl. at ¶ 6; see also A copy of Mr. Rouge's Resume, annexed to the Carberry Decl. as Exhibit "EE."  Mr. Rouge was a competent and very efficient employee who A.C. O'Hanlon has directly supervised for over ten years, and Mr. Rouge had working knowledge of the financial resources this division relies upon and the work needed to foster and continue those relationships in a mutually beneficial manner.  See O'Hanlon Decl. at ¶ 6.

97.     Although Assistant Commissioner O'Hanlon has no specific recollection of receiving or reviewing plaintiff's application for the position of Director of Policy Analysis and Operations, upon review of plaintiff's resume, Assistant Commissioner O'Hanlon noted that it is apparent that Mr. Jimenez has a long history working within HPD; however, his resume does not reflect any prior experience in the area of supportive housing for the homeless, or any knowledge of the very unique work which is done in SPHN and not duplicated in any other unit or division within HPD, especially as it relates to the external agencies with which we coordinate efforts. See O'Hanlon Decl. at ¶ 7; see Exhibit "C."

98.     Assistant Commissioner O'Hanlon, who was fifty-four (54) years old at the time he made the decision to hire Mr. Rouge, further explained that at no time in the selection process, did race, national origin or age of the prospective candidates play any role in the decision making process.  See O'Hanlon Decl. at ¶ 8.  Moreover, A.C. O'Hanlon explained that upon information and belief Mr. Rouge is also over the age of forty.  Id.

99.     In or about April, 2005, there was a vacancy for the position of Director of Administration, for which a vacancy notice was prepared and distributed citywide.  <u>See</u> Declaration of Bernard Schwarz in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Schwarz Decl.") at ¶ 8, annexed to the Carberry Decl.; <u>see also</u> Job Vacancy Notice bearing Transmittal Number 806-05-155, annexed to the Carberry Decl. as Exhibit "FF."  The posted salary range for this position was from $60,000 to $70,000 per annum. <u>Id.</u>

100.    The successful candidate for the above position would supervise all aspects of employee discipline at HPD, including the management of three employees charged with investigating allegations of employee misconduct and incompetence, reviewing those investigative findings, and when warranted, overseeing the drafting of charges, and represent HPD at internal disciplinary hearings and external hearings at the New York City Office of Labor Relations, and/or the New York City Office of Administrative Trials and Hearings and Arbitration proceedings.  <u>Id.</u>; <u>see also</u> Schwarz Decl. at ¶¶ 9-10.

101.    Deputy Commissioner Schwarz reviewed all the resumes submitted for the position of Director or Administration, interviewed and selected the most experienced and best candidate for the position which was Ms. Dawn Naidu-Walton.  <u>Id.</u> at ¶ 11.

102.    Ms. Naidu-Walton was the best candidate for the position because she had extensive experience in personnel and staff management, discipline and labor relations experience both at HPD and as Deputy Director of Personnel for the City of Kissimmee, Florida.  <u>See</u> Schwarz Decl. at ¶ 12; <u>see</u> <u>also</u> A copy of Ms. Naidu-Walton's Resume which is annexed to the Carberry Decl. as Exhibit "GG."  Moreover, Deputy Commissioner Schwarz had previously supervised Ms. Naidu-Walton is regarded as a successful and highly motivated employee, who

also served (before Ms. Allen) as the Assistant Director of Staff Management reporting directly to the Director of Staff Management.  See Schwarz Decl. at ¶ 12.  In addition, Ms. Naidu-Walton had extensive experience in all areas of HPD, and possessed technical knowledge of the internal workings of HPD coupled with superb knowledge of human resources and staffing matters, including the New York Civil Service Law.  Id.

103.    Although Deputy Commissioner Schwarz has no specific recollection of plaintiff's application, upon review of plaintiff's resume Deputy Commissioner Schwarz explained that it reflects no experience in implementing the New York Civil Service Laws or other personnel rules and regulations, nor did plaintiff's resume reflect any experience or knowledge of disciplinary matters.  Id. at ¶ 13; see also Exhibit "C."

104.    At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Deputy Commissioner Schwarz's decision making process.  See Schwarz Decl. at ¶ 14.  In fact, Deputy Commissioner Schwarz was fifty-six years old at the time he decided to promote Ms. Naidu-Walton who upon information and belief, is an African American woman over the age of forty.  Id.

105.    On or about May 17, 2005, there was a vacancy in the Division of Anti-Abandonment for the position of Deputy Director of Special Projects for which a vacancy notice was prepared and distributed citywide.  See a copy of the Job Vacancy Notice bearing Transmittal Number 806-05-198, annexed to the Carberry Decl. as Exhibit "HH."  Plaintiff testified that he was promoted to this position, although he alleges that he was already conducting the duties of the position for over three years prior to this posting and his subsequent promotion.  See Exhibit "B," at p. 43:15 to p. 45:24.

106.    806-06-010

107.     In or about August, 2005, there was a vacancy for the position of Associate Staff Analyst (Assistant to the Deputy Commissioner) for Housing Operations, accordingly, a vacancy notice was prepared and distributed citywide for the position.   See Declaration of Laurie LoPrimo in Support of Defendant's Motion for Summary Judgment, dated September 12, 2008 ("LoPrimo Decl.") at ¶ 2, annexed to the Carberry Decl.; see also a copy of the Job Vacancy Notice bearing Transmittal Number 806-06-010, annexed to the Carberry Decl. as Exhibit "II." The posted salary range for this position was from $49,778 to $74,118 per annum.  Id.

108.     This was an entry level position, in which the person would amongst other duties and responsibilities, serve as Deputy Commissioner LoPrimo's assistant and be required to aid her in the management of functional areas within the Division of Tenant Resources (DTR) Section 8 Program and perform extensive monitoring and analysis of DTR's then, new and enhanced leasing, continued occupancy, moves and portability, customer service, quality assurance and administrative units.  Id.  In addition the successful candidate would research and prepare responses to correspondence from politicians, community members and not-for-profit and for-profit organizations and conducting research and prepare reports on intra-division and inter-agency issues that are of immediate concern to the Agency.  Id.

109.     In accordance with the general practice of Deputy Commissioner LoPrimo, all applicants were screened by DTR's personnel unit, utilizing the aforementioned criteria and forwarded to Deputy Commissioner LoPrimo a list of candidates who's resumes reflected the requisite experience and background.  See LoPrimo Decl. at ¶ 4.  After the resumes were sorted, Deputy Commissioner LoPrimo interviewed and selected the best candidate for the position, Ms. Kathleen Mullin.  Id.

110.    Ms. Mullin was the best candidate for the position because she was very well educated, was a very effective communicator, excellent writer and she was well suited for an entry level position of this nature.  See LoPrimo Decl. at ¶ 5; see also A copy of Ms. Mullin's resume which is annexed to the Carberry Decl. as Exhibit "JJ."

111.    In contrast, although Deputy Commissioner LoPrimo does not specifically recall receiving or reviewing plaintiff's application for this positing at the time of the search, upon review of plaintiff's resume Deputy Commissioner LoPrimo explained that plaintiff was already functioning as a Deputy Director, therefore, it was her opinion that this position was below plaintiff's level of experience and skills.  See LoPrimo Decl. at ¶ 6; see also Exhibit "C."

112.    At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Deputy Commissioner LoPrimo's decision making process, in fact Deputy Commissioner LoPrimo was forty-two years old at the time she decided to hire Ms. Mullin.  See LoPrimo Decl. at ¶ 7.

113.    806-06-038

114.    In or about November, 2005, there was a vacancy for the position of Assistant Commissioner of HPD's Division of Anti-Abandonment ("DAA"), for which a vacancy notice was prepared and distributed citywide.  See Warren Decl. at ¶ 9; see also Job Vacancy Notice bearing Transmittal Number 806-06-038, annexed to the Carberry Decl. as Exhibit "KK."  The posted salary range for this position was from $80,000 to $110,000 per annum.  Id.

115.    The successful candidate for the above position would supervise the day-to-day operations of the DAA program units including: Administrative Services, Field Operations (which includes four borough offices and Owner Services Program), Neighborhood Preservation Consultants/Community Consultant Contract Program, and the Third Party Transfer/Tax Lien

Sales.  Id.  In addition, the selected candidate would be responsible for the coordination and management of Mayoral Preservation Initiatives, such as the Bushwick Initiative and Predatory Lending as well as identifying potentially distressed buildings and development of treatment plans to reverse the distress.  Id.; see also Warren Decl. at ¶ 10.

116.    All the resumes submitted for the position of Assistant Commissioner of DAA were forwarded to Luiz Aragon, Deputy Commissioner of HPD because the successful candidate would report directly to him.  Deputy Commissioner Aragon interviewed several candidates he believed met the requirement of the position.  See Warren Decl. at ¶ 12.  After Deputy Commissioner Aragon completed his interviews, he forwarded to First Deputy Commissioner Warren the resume of Mr. David Pechefsky, then the Assistant Director of the Finance Division of the New York City Council.  See Warren Decl. at ¶ 12.  Thereafter, First Deputy Commissioner Warren reviewed Mr. Pechefsky's resume and interviewed him.  See Warren Decl. at ¶ 12.  Upon completion of the interview of Mr. Pechefsky, First Deputy Commissioner Warren determined that Mr. Pechefsky was the best candidate for the position of Assistant Commissioner of DAA.  Id.

117.    Mr. Pechefsky was the best candidate for the position because he had previously worked in the finance division at the New York City Council and was familiar with the not-for-profit entities with which we traditionally worked, he had extensive knowledge of the City's contracting and budget process and the City's tax policy.  See Warren Decl. at ¶ 13; see also A copy of Mr. Pechefsky's resume which is annexed to the Carberry Decl. as Exhibit "LL."  Mr. Pechefsky had six years experience with the City Council Division responsible for housing policy matters, and had worked on numerous important issues in his capacity with the City Council.  See Warren Decl. at ¶ 13.  Mr. Pechefsky had worked closely with HPD managerial

staff, was well known to and respected by HPD's top management, and had worked directly with Michael Bosnick, the outgoing Assistant Commissioner of DAA.  Id.  In addition to his strong substantive experience and background, Mr. Pechefsky also was a very strong communicator and a very articulate individual who I believed would be able to effectively handle the duties of the Assistant Commissioner of DAA.  Id.

118.    Although First Deputy Commissioner Warren does not specifically recall reviewing plaintiff's resume for this position, upon review of plaintiff's resume, Mr. Warren explained that plaintiff has far less experience with the community groups, shows no substantive experience in financial and budgetary matters at the level this position required, and lacked knowledge of the City's tax policies.  See Warren Decl. at ¶ 14; see also Exhibit "C."

119.    At no point did plaintiff's race, age or national origin play a role in First Deputy Commissioner Warren's decision not to select plaintiff for the position of Assistant Commissioner of DAA.  See Warren Decl. at ¶ 15.

120.    In or about December, 2005, there was a vacancy for the newly created position of Director of Planning and Administration for DAA, for which a vacancy notice was prepared and distributed citywide.  See Declaration of David Pechefsky in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Pechefsky Decl.") at ¶ 2, annexed to the Carberry Decl.; see also a copy of the Job Vacancy Notice bearing Transmittal Number 806-06-052, annexed to the Carberry Decl. as Exhibit "MM."  The posted salary range for this position was from $79,000 to $90,000 per annum.  Id.

121.    The successful candidate for the above position would amongst other duties and responsibilities, supervise staff who compile and analyze data for the varying bi-weekly and other program monitoring reports, coordinate the overall management of the Mayoral Predatory

Lending Mayoral Initiative and assist the Assistant Commissioner with the planning and development of DAA long-term and short-term strategies to reverse the conditions in distressed buildings.  Id.  The successful candidate would also be required to interface with the Preservation Planning and Analysis Unit for research and analytical efforts in regard to DAA initiatives and programs and assisting the Assistant Commissioner with the planning of new DAA programs and marketing efforts and preparing correspondence for the Assistant Commissioner's signature, as well as program narratives for inclusion in annual reviews, or special presentations.  Id.

122.    In accordance with the general practice of DAA, all the resumes submitted for the position of Director of Planning and Administration for DAA were vetted by the human resources staff of the Deputy Commissioner for Preservation Services, and the minimally qualified candidates were forwarded to Assistant Commissioner Pechefsky for consideration.  See Pechefsky Decl. at ¶ 4.  Thereafter, Ms. Susan Carr, Director of Operations and Assistant Commissioner Pechefsky interviewed and selected the most experienced and best candidate for the position which was Mr. Ben Celaj.  Id.

123.    Mr. Ben Celaj was the best candidate for the job because he had significant real estate experience, having worked as a property manager and having served a Commissioner on the City of New York's Tax Commission, which involved reviewing real estate taxes, which were skills I believed filled the needs of the division.  See Pechefsky Decl. at ¶ 5; see also A copy of Mr. Celaj's Resume which is annexed to the Carberry Decl. as Exhibit "NN."

124.    Although Assistant Commissioner Pechefsky has no specific recollection of receiving or reviewing plaintiff's application for this position, upon review of plaintiff's resume A.C. Pechefsky noted that plaintiff's resume does not reflect substantial experiences with building finances.  See Pechefsky Decl. at ¶ 6; see also Exhibit "C."

125.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Assistant Commissioner Pechefsky's decision-making process.  See Pechefsky Decl. at ¶ 7.

126.     In or about January, 2006, there was a vacancy for the position of Associate Staff Analyst in DTR, for which a vacancy notice was prepared and distributed citywide.  See Declaration of John Musco in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Musco Decl.") at ¶ 2, annexed to the Carberry Decl.; see also Job Vacancy Notice bearing Transmittal Number 806-06-055, annexed to the Carberry Decl. as Exhibit "OO." The posted salary range for this position was from $49,778 to $74,118 per annum.  Id.

127.     However, it was later determined that this position would not be filled.  See Musco Decl. at ¶ 3.  Accordingly, no one was promoted or hired for this position.  Id.

128.     In or about January, 2006, there was a vacancy for the newly created position of Director of Customer Services and Citywide Initiatives, for which a vacancy notice was prepared and distributed citywide.  See Mustaciuolo Decl. at ¶ 8; see also Job Vacancy Notice bearing Transmittal Number 806-06-059, a copy of which annexed to the Carberry Decl. as Exhibit "PP."  The posted salary range for this position was from $65,000 to $85,000 per annum.  Id.

129.     The successful candidate for the above position would amongst other duties and responsibilities, coordinate several customer services and marketing activities involving the various divisions and programs of Enforcement Services, including coordinating with OPS staff the customer service initiatives underway throughout the agency as they pertain to Enforcement Services programs, integrate and develop Customer Service focused enhancements for Enforcement staff, which promotes a professional and consistent attitude of staff towards members of the public, review all program public materials to insure the content is updated and

in appropriate formats and develop, implement and analyzing surveys to determine the effectiveness of customer service initiatives within Enforcement Services.  Id.

130.    In accordance with Mr. Mustaciuolo's general practice, all resumes were collected and vetted by members of the division's human resources staff, Gisela Ruiz, Cindy Ramos, and Roslyn Collins, who then forwarded the qualified candidates to him for consideration.  See Mustaciuolo Decl. at ¶ 10.  Ms. Ruiz and Ms. Ramos are Hispanic. Id.  Thereafter, Mr. Mustaciuolo interviewed and selected the most qualified candidate for the position of Director of Customer Services and Citywide Initiatives, Ms. Debra Markell.  Id.

131.    Ms. Markell was the best candidate for the job because she possessed all the experiences I sought in the successful candidate, she was a Director of the Mayor's Community Assistance Unit for over eight (8) years where she represented the Mayor of the City of New York at Community Board meetings, District Service meetings, Precinct Community Council meetings, and other Civic and Community meetings.  Accordingly, she had developed significant relationships with many communities throughout the City in several boroughs and had the necessary skills to communicate HPD's messages effectively.  Id. at ¶ 11;  see also A copy of Ms. Markell's resume which is annexed to the Carberry Decl. as Exhibit "QQ."

132.    In contrast, although Mr. Mustaciuolo has no specific recollection of receiving or reviewing plaintiff's application for the position, upon review of plaintiff's resume, he has very little exposure and experience working with Community Groups on the scale Mr. Mustaciuolo sought for this position.  See Mustaciuolo Decl. at ¶ 12; see also Exhibit "C."  Moreover, Mr. Mustaciuolo notes that there is no evidence from his resume that he had any current ongoing relationship with community organizations throughout the City of New York, or that he would be able to effectively communicate HPD's messages to varying types of organizations.  See

Mustaciuolo Decl. at ¶ 12. At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Mr. Mustaciuolo's decision making process. Id.. In fact, Mr. Mustaciuolo was forty-four years old when he made the decision to hire Ms. Markell, who upon information and belief, is also over the age of forty. Id.

133.    In or about March, 2006, there was a vacancy for the newly created position of Director of Support Services, for which a vacancy notice was prepared and distributed citywide. See Mustaciuolo Decl. at ¶ 14; see also Job Vacancy Notice bearing Transmittal Number 806-06-093, a copy of which annexed to the Carberry Decl. as Exhibit "RR." The posted salary range for this position was from $76,511 to $96,817 per annum. Id.

134.    The successful candidate for the above position would amongst other duties and responsibilities, plan and coordinate the efforts of the Enforcement Services program units: the Citywide Callback Unit, the Emergency Services Bureau, Research and Reconciliation, and the Special Enforcement Unit. Id. In addition, the successful candidate would be responsible for preparing directives and procedures pertaining to program activities and planning initiatives, restructure staffing operation to meet the requirements of new legislative, administrative mandates and planning initiatives, representing the Department at public hearings and with other agencies and organizations, both private and public and work on special projects as they arise. Id.

135.    In accordance with Mr. Mustaciuolo's general practice, all resumes were collected and vetted by members of the division's human resources staff, two of whom were Hispanic, Gisela Ruiz, Cindy Ramos and Roslyn Collins, who then forwarded the qualified candidates to him for consideration. See Mustaciuolo Decl. at ¶ 16. Thereafter, Mr. Mustaciuolo interviewed and selected the most qualified candidate for the position of Director of Support Services, Ms. Grace Defina. Id.

136.    Ms. Defina was the best candidate for the job because she possessed all the experience and preferred skills I sought in the successful candidate.  Id. at ¶ 17.

137.    Ms. Defina, is an attorney who at the time of the posting was assigned to work in the Division of Code Enforcement, a unit Mr. Mustaciuolo supervised.  Id. at ¶ 18.  Ms. Defina had played an integral role in the creation and restructuring of the Division of Code Enforcement and the Division of Maintenance.  Id.; see also A copy of Ms. Defina's resume which is annexed to the Carberry Decl. as Exhibit "SS."  In addition, Ms. Defina was an invaluable member of Mr. Mustaciuolo' staff who he often relied upon to interpret varying laws which affected HPD, and units under his supervision, and she was often called upon to write and edit complex proposals to conform to legislative guidelines.  See Mustaciuolo Decl. at ¶. 18.  Ms. Defina's law degree set her apart from all the other candidates because, it was Mr. Mustaciuolo's position that the housing maintenance code needed to be changed, and she had previously demonstrated the ability and skills to take on that task even before she was interviewed, and had incredible knowledge of the housing maintenance code.  Id.  In addition, Ms. Defina had a unique knowledge of all the units the position of Director of Support Services would be called upon to supervise, and in Mr. Mustaciuolo's opinion could do so without delay.  Id.

138.    Although Mr. Mustaciuolo has no specific recollection of receiving or reviewing plaintiff's application for the position of Director of Support Services, upon review of plaintiff's resume.  Mr. Mustaciuolo explained that plaintiff he has no experience working with or in any of the units this position would be called upon to supervise and would not be able to effectively transition into the position without extensive retraining.  Id. at ¶ 19; see also Exhibit "C." Furthermore, plaintiff did not possess any of the preferred skills Mr. Mustaciuolo sought in the successful candidate as detailed above and in the Vacancy Notice for the position of Director of

Support Services, nor did he possess any code enforcement experience or sufficient knowledge of the housing maintenance code.  Id.

139.    At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Mr. Mustaciuolo's decision making process.  Id. at ¶ 20. In fact, Mr. Mustaciuolo was forty-four years old when he made the decision to hire Ms. Defina. Id.

140.    In or about March, 2006, there was a vacancy for the newly created position of Director of Operations in the Division of Maintenance, for which a vacancy notice was prepared and distributed citywide.  See Mustaciuolo Decl. at ¶ 21; see also Job Vacancy Notice bearing Transmittal Number 806-06-100, a copy of which annexed to the Carberry Decl. as Exhibit "TT."  The posted salary range for this position was from $90,000 to $100,000 per annum.  Id.

141.    The successful candidate for the position of Director of Operations would amongst other duties and responsibilities, would assist with the oversight of program activities for the Emergency Repair Bureau, Technical Operations, Demolition and Emergency Services, the Bureau of Environmental Hazards, and the Procurement Unit.  Id.  In addition the candidate would work to ensure the integrity of the procurement process involving contractual services to eliminate emergency conditions is maintained, implement directives and procedures pertaining to DOM activities, assist with restructuring and supervising staff operations to assure compliance with city and agency mandated codes of conduct and the requirements of new legislative and administrative mandates.  Id.  Represent the Department at meetings and public hearings, with other agencies and organizations, both private and public and provide oversight for budgetary, productivity and analytical reports.  Id.  Moreover, the successful candidate would be responsible for assuming the duties and responsibilities of the Assistant Commissioner in his/her absence. Id.

142.     In accordance with Mr. Mustaciuolo's general practice, all resumes were collected and vetted by members of the division's human resources staff, Gisella Ruiz, Cindy Ramos and Roslyn Collins, who then forwarded the qualified candidates to him.  See Mustaciuolo Decl. at ¶ 23.  Thereafter, Mr. Mustaciuolo interviewed and selected the most qualified candidate for the position of Director of Operations, Ms. Amy Marcus.  Id.

143.     Ms. Marcus, an attorney, was the best candidate for the job because she brought extensive and in-depth experience in administration, management and federal, state and city laws, rules and regulations as it dealt with employment, ethics and contract issues.  Id. at ¶ 24. Ms. Marcus also had extensive experience with labor relations having served as the Director of Labor Relations at HPD.  Id.; see also A copy of Ms. Marcus's resume which is annexed to the Carberry Decl. as Exhibit "UU."

144.     Although Mr. Mustaciuolo has no specific recollection of receiving or reviewing plaintiff's application for the position of Director of Operations, upon review of plaintiff's resume, he has no procurement or contracting experience at the high level Mr. Mustaciuolo sought for the successful candidate.  See Mustaciuolo Decl. at ¶ 25; see also A copy of plaintiff's resume, annexed to the Carberry Decl., as Exhibit "C."

145.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Mr. Mustaciuolo's decision making process.  Id. at ¶ 26. In fact, Mr. Mustaciuolo was forty-four years old when he made the decision to hire Ms. Marcus, who upon information and belief is over the age of forty.

146.     In or about April, 2006, there was a vacancy for the position of Associate Staff Analyst in DTR, for which a vacancy notice was prepared and distributed citywide.  See Musco Decl. at ¶ 4; see also Job Vacancy Notice bearing Transmittal Number 806-06-108, annexed to

the Carberry Decl. as Exhibit "VV."  The posted salary range for this position was from $51,396 to $76,527 per annum.  Id.

147.    However, it was later determined that this position would not be filled.  See Musco Decl. at ¶ 5.  Accordingly, no one was promoted or hired for this position.  Id.

148.    In or about April, 2006, there was a vacancy for the position of Director of Housing Quality Standards, accordingly, a vacancy notice was prepared and distributed citywide for the position.  See Declaration of Assistant Commissioner Patricia Zafiriadis, dated September 19, 2008 ("Zafiriadis Decl.,") at ¶ 2, annexed to the Carberry Decl.; see also A copy of the Job Vacancy Notice bearing Transmittal Number 806-06-118, annexed to the Carberry Decl. as Exhibit "WW."  The posted salary range for this position was from $65,000 to $75,000 per annum.  Id.

149.    The successful candidate for the above position would oversee the day-to-day operations of eleven quality standard units charged with conducting citywide inspections of apartments subsidized by the Section 8 Program and managing a staff of approximately thirty-one (31) inspectors and support staff.  Id.  The successful candidate would have inspection experience because that individual would be called upon to conduct periodic supervisory inspections, and conduct periodic performance appraisals of staff, and train, manage and ensure that staff complies with the inspection standards set forth in Federal and Local Regulations and Policy Guidelines.  See also id.

150.    In accordance with Assistant Commissioner Zafiriadis' general practice, all applicant was screened by DTR's Personnel Manager John Musco, utilizing the aforementioned criteria and forwarded to Assistant Commissioner Zafiriadis a list of candidates who's resumes reflected the requisite experience and background.  See Zafiriadis Decl., at ¶ 4.  Plaintiff was not

a final candidate.   Id.   After the resumes were sorted, Assistant Commissioner Zafiriadis interviewed and selected the best qualified candidate, Ms. Carrol Dixon for the position of Director of Housing Quality Standards.

151.   Ms. Dixon was the best candidate for the position because she had a superb history in the agency as a Director of Program Operations where she coordinated procedures for varying programs including the Lead Abatement program which involved varying levels of inspection and coordinated responses to varying concerns of clients and other agencies.   See Zafiriadis Decl., at ¶ 5; see also A copy of Ms. Dixon's Resume which is annexed to the Carberry Decl. as Exhibit "XX."  Ms. Dixon also had extensive property management and field work experience which were compelling, she had very good interpersonal skills and was known throughout he agency to be an excellent team player and a hard worker.   Id.; see also Zafiriadis Decl., at ¶ 5.  In addition, Ms. Dixon was highly recommended by her immediate supervisor.   Id.

152.   In contrast, although Assistant Commissioner Zafiriadis did not have any recollection of receiving or reviewing plaintiff's application or resume for the position, upon later review of plaintiff's resume, it was apparent to Assistant Commissioner Zafiriadis that plaintiff did not have any experience in inspections and could not have effectively lead such a field intensive unit without said experience.   Id. ¶ at 6; see also Exhibit "C."  At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Assistant Commissioner Zafiriadis' decision making process.   Id. at ¶ 7.  It should also be noted that upon information and belief, Ms. Dixon is also an African American woman over the age of forty.   Id.

153.   In or about May, 2006, there was a vacancy for the position of a provisional Housing Development Specialist L-2, carrying the in-house title of Director of the Senior Citizen

Rent Increase Exemption Program ("SCRIE"), for which a vacancy notice was prepared and distributed citywide.  See Declaration of Julie Walpert in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Walpert Decl.") at ¶ 2, annexed to the Carberry Decl.; see also Job Vacancy Notice bearing Transmittal Number 806-06-147, a copy of which annexed to the Carberry Decl. as Exhibit "YY."  The posted salary range for this position from $48,270 to $71,306 per annum.  Id.

154.    The successful candidate for the above position would be responsible for the implementation of the SCRlE Program including the processing and computerization of applications and all related issues.  Id.  The selected candidate would respond to inquiries from staff as well as various outside groups and managing agents regarding SCRIE, prepare reports and respond to correspondence within required deadlines; supervise six to seven staff members; and possess a very strong technical knowledge in order to communicate effectively with the technical support staff while simultaneously communicating with the elderly and supervising a staff consisting of a mixed group, some of whom require heavy supervision in both their technical skills and communication with the public.  Id.; see also Walpert Decl. at ¶ 3.

155.    In accordance with Assistant Commissioner Walpert's general practice, she assigned staffs member to sort through the pool of resumes, and to interview those candidates who from a review of their resumes, had experience in the SCRIE program.  Id. at ¶ 4. After that initial screening by Assistant Commissioner Walpert's staff, and interviews conducted by Elaine Smith and Gary Sloman[5], they recommended that Ms. Collymore be hired to fill the position of the Director of the SCRIE program.  Id.

**A.** _____

[5] Because of a change in organizational structure, this position was now going to report directly to Mr. Sloman but had previously reported to Ms. Smith.

156.    Assistant Commissioner Walpert accepted the recommendation of Ms. Smith and Mr. Sloman and selected Ms. Marla Collymore to fill the position of Director of SCRIE. Id. at ¶ 5.

157.    Ms. Collymore was the best candidate for the job because she was already employed in DHS as a Special Projects Associate as of January 2004, and had experience in planning, analysis and had coordinated various efforts and programs within the Division of Housing Supervision ("DHS"). Id. at ¶ 6; see also A copy of Ms. Collymore's resume which is annexed to the Carberry Decl. as Exhibit "ZZ."  In addition, during her tenure with DHS, Assistant Commissioner Walpert had the opportunity to observe Ms. Collymore's performance firsthand and knew her to be a fast learner, self starter, excellent at motivating the staff, very intelligent and an individual who could be trusted with confidential matters. See Walpert Decl. at ¶ 6.  Further, throughout her time with DHS, Ms. Collymore routinely took on additional responsibilities as assigned and had distinguished herself as a superior employee. Id.

158.    There is no record that plaintiff submitted an application/resume for this posting. Id. at ¶ 7; see also A copy of the EEO Worksheet, annexed to the Carberry Decl., as Exhibit "AAA.

159.    At no time in the selection process, did race, national origin or age of the prospective candidates play any role in Assistant Commissioner Walpert's decision making process. See Walpert Decl. at ¶ 8.  In fact, Assistant Commissioner Walpert was forty-one years old at the time she made the decision to promote Ms. Collymore. Id. Furthermore, Ms. Collymore is a black woman. Id.

160.    In or about May, 2006, there was a vacancy for the position of Assistant Commissioner of HPD's Division of Anti-Abandonment ("DAA"), for which a vacancy notice

was prepared and distributed citywide.  See Aragon Decl. at ¶ 14; see also Warren Decl. at ¶ 16, annexed to the Carberry Decl.; see Job Vacancy Notice bearing Transmittal Number 806-06-156, annexed to the Carberry Decl. as Exhibit "BBB."  The posted salary range for this position was from $100,000 to $120,000 per annum.  Id.

161.    The successful candidate for the above position would amongst other duties supervise the day-to-day operations of DAA program units including: Administrative Services, Field Operations (which includes four borough offices and Owner Services Program), Neighborhood Preservation Consultants/Community Consultant Contract Program, and the Third Party Transfer/Tax Lien Sales.  Id.  In addition, the selected candidate would be responsible for the oversight of forty-four (44) not-for-profit housing organizations that assist DAA borough offices in their housing preservation work, and coordinate research and analytical efforts to define the nature of the housing problems.  Id.; see also Aragon Decl. at ¶ 15; Warren Decl. at ¶ 17.

162.    In accordance with Deputy Commissioner Aragon's general practice, all the resumes of the applicants were collected and vetted by his human resources unit to ensure that they meet the basic credentials as detailed in the aforementioned posting.  See Aragon Decl. at ¶ 16.  Commissioner Aragon then reviewed the resumes of the qualified individuals, interviewed and selected Mr. William Carbine for the position of Assistant Commissioner of HPD's DAA.  See Aragon Decl. at ¶ 16.  Deputy Commissioner Aragon then forwarded his recommendation to First Deputy Commissioner John Warren that Mr. Carbine be selected for the position of Assistant Commissioner of HPD's DAA.  See Aragon Decl. at ¶ 22; see also Warren Decl. at ¶ 19.

163.     First Deputy Commissioner John Warren concurred with the recommendation of Deputy Commissioner Aragon that Mr. Carbine be selected for the position of Assistant Commissioner of HPD's DAA.  Id. at ¶ 19.

164.     Mr. Carbine was the best candidate for the position of because he had significant experience at HPD at a high level, most recently preceding his application as an Assistant Commissioner at HPD for several years and had always performed at the highest level and developed a reputation in the agency as a hard worker an individual who could problem solve and address varying issues with poise and an eye on the final goal.  See Aragon Decl. at ¶ 17; see also Warren Decl. at ¶ 20; see also A copy of Mr. Carbine's resume which is annexed to the Carberry Decl. as Exhibit "CCC."  Mr. Carbine also had a great deal of diverse experience in operations, contracting, procurement, budgetary matters, served as a liaison with various not-for-profits and communities and possessed a strong managerial background at varying levels.  See Aragon Decl. at ¶ 23; see also Warren Decl. at ¶ 20.

165.     In contrast, upon review of plaintiff's resume Deputy Commissioners Aragon and Warren explained that plaintiff had no substantive experience handling large budgets, he had far less experience working with the community groups, and not-for-profit groups, and possessed no discernable knowledge of the City's tax policies or procurement procedures.  See A copy of plaintiff's resume, annexed to the Carberry Decl., as Exhibit "C;" see also Aragon Decl. at ¶ 24; see also Warren Decl. at ¶ 21.

166.     At no time in the selection process, did race, national origin or age of the prospective candidates play any role in the decision making process as evidenced by the fact that Deputy Commissioner Aragon is Hispanic and was forty-seven years old when he made the decision to promote Mr. Carbine.  See Aragon Decl., at ¶ 25; see also Warren Decl., at ¶ 22.

167.    In or about May, 2006, due to the resignation of the incumbent legislative liaison, there was a vacancy for the position of Legislative Assistant in the Division of Policy and Program Analysis of HPD.  See Declaration of Harold Shultz in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Shultz Decl.") at ¶ 2, annexed to the Carberry Decl.  Accordingly, at the direction of Special Counsel Shultz, a vacancy notice was prepared and distributed citywide for the position of Legislative Assistant in the Division of Policy and Program Analysis of HPD.  Id.; see also A copy of the Job Vacancy Notice bearing Transmittal Number 806-06-170, annexed to the Carberry Decl. as Exhibit "DDD."  The posted salary range for this position was from $90,000 to $110,000 per annum.  Id.

168.    The successful candidate for the position of Legislative Assistant in the Division of Policy and Program Analysis of HPD would amongst other duties be responsible for reading, understanding, and interpreting to program staff, federal statutes and rules that apply to HPD's programs and that affect the housing stock of New York City, advising HPD program station how to comply with federal requirements.  Id.  Furthermore, the successful candidate would serve as the primary liaison with New York City's Washington, DC lobbying office to insure that HPD's issues are understood and properly advocated in the federal legislative and budgetary process, including the preparation of position papers, and liaison with the NYC Office of Management and Budget and other national, state and local organizations in relation to federal housing policy issues.  Id.; see also Shultz Decl. at ¶ 3; see also Declaration of Joseph Rosenberg in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Rosenberg Decl.") at ¶ 3, annexed to the Carberry Decl.

169.    Moreover, the successful candidate would be a person who understood and had experience with the varying political and policy makers and procedures in the federal

government, the U.S. Department of Housing and Urban Development ("HUD") dealing with varying housing issues.  <u>See</u> Shultz Decl. at ¶ 4.  Prior experience as a lobbyist, or as a legislative aid was a necessity, as well as strong communication skills, excellent writer and experience reading, interpreting and drafting legislation.  <u>Id.</u>

170.    Special Counsel Shultz reviewed all the resumes submitted for the position of Legislative Assistant in the Division of Policy and Program Analysis and interviewed fifteen (15) candidates from whom he selected Ms. Alexandra Sewell for the position of Legislative Assistant in the Division of Policy and Program Analysis.  <u>See</u> Shultz Decl. at ¶ 4; <u>see</u> <u>also</u> A Copy of the List of Applicants (a total of forty-two applicants) for the position of Legislative Assistant in the Division of Policy and Program Analysis, which is annexed to the Carberry Decl. as Exhibit "EEE."  Upon review of the exhaustive list of applicants, it is apparent that Mr. Jimenez did not submit an application for this position.  <u>Id.</u>

171.    Ms. Sewell was the best candidate for the position because she had extensive experience in the Federal budgetary system, having worked as a staff member of the United States Senate Committee on Appropriations for several years where she advised members of the Senate Appropriations Committee, the Department of Housing and Urban Development, Neighborhood Reinvestment Corporation, Community Development Financial Institutions, the Department of Homeland Security and Federal Emergency Management Agency on policy and budgetary matters.  <u>See</u> Shultz Decl. at ¶ 6; <u>see</u> <u>also</u> Rosenberg Decl. at ¶ 6 – 7; <u>see</u> <u>also</u> A copy of Ms. Sewell's Resume which is annexed to the Carberry Decl. as Exhibit "FFF."

172.    Furthermore, Ms. Sewell had intimate knowledge of housing appropriation issues and how it worked on a federal level, including how the U.S. Senate operated, having interacted and advised members of the U.S. Senate and their staff on varying housing issues, many of

which directly affected HPD's federal allocation which totals in excess of five-hundred million dollars ($500M). See Shultz Decl. at ¶ 7.

173.   Although Special Counsel Shultz's records reflect that plaintiff did not apply for the position of Legislative Assistant in the Division of Policy and Program Analysis, upon a later review of plaintiff's resume as provided to Special Counsel Shultz and Deputy Commissioner Rosenberg, it was immediately apparent that Mr. Jimenez was not qualified for the position of Legislative Assistant in the Division of Policy and Program Analysis, because he possessed absolutely no legislative experience and had not worked with the Federal appropriations or budgeting process, nor did he possess any lobbying experience. See Shultz Decl. at ¶ 8; see also Rosenberg Decl. at ¶ 8; see also Exhibit "C."

174.   Accordingly, Special Counsel Shultz advised his colleague, HPD Deputy Commissioner of Intergovernmental Relations Joseph Rosenberg of the selection of Ms. Sewell for position of Legislative Assistant in the Division of Policy and Program Analysis of HPD. See Shultz Decl. at ¶ 9; see also Rosenberg Decl. at ¶ 5.

175.   Deputy Commissioner of Intergovernmental Relations Joseph Rosenberg met with Ms. Sewell and agreed with Mr. Shultz's decision to hire her for the position of Legislative Assistant in the Division of Policy and Program Analysis. See Rosenberg Decl. at ¶ 5; see also Shultz Decl. at ¶ 9.

176.   At no time in the selection process, did race, national origin or age of the prospective candidates play any role in the decision making process, in fact, Deputy Commissioner Rosenberg is 52 years old and Special Counsel Shultz is 59 years old. See Rosenberg Decl. at ¶ 9; see also Shultz Decl. at ¶ 10.

177.    In or about June, 2006, there was a vacancy for the newly created position of Director of Policy Analysis and Operations for which a vacancy notice was prepared and distributed citywide.  See Declaration of Miriam Colon in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Colon Decl.") at ¶ 2, annexed to the Carberry Decl.; see also A copy of the Job Vacancy Notice bearing Transmittal Number 806-06-180, annexed to Carberry Decl. as Exhibit "GGG."  The posted salary range for this position was from $60, 000 to $80,000 per annum.  Id.

178.    The successful candidate for the position of Director of Policy Analysis and Operations would be responsible for developing and supervising the implementation of administrative, personnel, budget, policy, and planning initiatives, provide analysis and recommendations for the implementation of new division related initiatives, and evaluate and oversee the division's priority projects and work with the Assistant Commissioner and program directors to define the vision and goals that will guide the division's work.  See id.

179.    In addition, Ms. Colon also sought an individual who had a broad prospective and experience working with tax laden housing issues and who could easily read documents, analyze them and extract relevant info and make recommendations to Assistant Commissioner Colon in order to assist in her in the decision making process.  See Colon Decl. at ¶ 4.  Furthermore, Assistant Commissioner Colon sought a candidate who was a fast learner and willing to take on a variety of projects, be an independent thinker and take the initiative to follow through on tasks and bring new recommendations to the table.  Id.

180.    Assistant Commissioner Colon reviewed all the resumes submitted for the position of Director of Policy Analysis and Operations and interviewed the candidates she believed had the most applicable skills and experience.  See Colon Decl. at ¶ 5.  After a review

of the resumes and interview of possible candidates, Assistant Commissioner Colon selected the most experienced and best suited candidate for the position of Director of Policy Analysis and Operations, Ms. Elaine Toribio.  Id.

181.    Ms. Toribio was the best candidate for the position because she worked at the Citizen Housing and Planning Council for several years as a Senior Policy Analyst where she reviewed and evaluated varying tax incentive programs, evaluated various housing programs and initiatives, and also had significant experience managing projects where she had to direct and supervise professionals at varying levels.  See Colon Decl. at ¶ 6; see also A copy of Ms. Toribio's resume which is annexed to the Carberry Decl. as Exhibit "HHH."  Moreover, Ms. Toribio was very successful in her prior position and received glowing recommendations from her references and other colleagues.  See Colon Decl. at ¶ 6.

182.    In contrast, although Assistant Commissioner Colon had no specific recollection of reviewing or receiving plaintiff's resume for the position of Director of Policy Analysis and Operations, upon review of plaintiff's resume, it was apparent that he was more of an analyst with some supervisory experience while the position of Director of Policy Analysis and Operations required a decision maker and a policy shaper.  See Colon Decl. at ¶ 7; see also Exhibit "C."  Furthermore, plaintiff's resume does not reflect any experience or background in tax benefit programs, analysis of complex housing issues to effect policy and the ability to make sound recommendations to shape housing policy.  Id.; see also Colon Decl. at ¶ 7.  While plaintiff possessed admirable skills, his resume does not reflect that he possesses experience running some of the larger programs in the units to which he was previously assigned.  Id.

183.    At no time in the selection process, did race, national origin or age of the prospective candidates play any role in the decision making process, in fact Assistant

Commissioner Colon is Puerto Rican and was fifty-six (56) years old when she made the decision to hire Ms. Toribio who upon information and belief is also Hispanic.  See Colon Decl. at ¶¶ 8-9.

184.   In or about June, 2006, there was a vacancy for the position of Project Manager in the NYCHA Collaboration Program, for which a vacancy notice was prepared and distributed citywide.  See Declaration of Wendell Walters in Support of Defendant's Motion for Summary Judgment, dated September 19, 2008 ("Walters Decl.") at ¶ 2, annexed to the Carberry Decl; see also Job Vacancy Notice bearing Transmittal Number 806-06-189, a copy of which annexed to the Carberry Decl. as Exhibit "III."  The posted salary range for this position was from $51,396 to $76,572 per annum.  Id.

185.   The successful candidate for the above position would amongst other duties and responsibilities, review, analyze and score development proposals solicited through a Request for Proposals (RFP), serve as expeditor for projects before and during construction; serve as a liaison with developers, lenders, various divisions within HPD and other agencies, review and analyze development budgets and projects' financing, work with the Director, developers, lenders and other agencies to bring projects to construction loan closing and construction completion and assist the Director with tracking the flow of work for assigned projects; and prepare reports.  Id.

186.   All resumes were collected and vetted by members of Mr. Walters' staff, Ms. Nelva Taub with assistance provided by Administrative Assistant, Shayana Chambers.  See Walters Decl. at ¶ 4.  The qualified candidates were then forwarded to the Director, Wendy Reitmeier to review and interview candidates.  Id.  The Director, Wendy Reitmeier interviewed and selected Mr. Jeffrey Geller for the position of Project Manager in the NYCHA Collaboration

Program.  Id.  Upon selection of Mr. Geller, Ms. Nelva Taub Director of Operations participated

in a second interview of Mr. Geller and agreed with Ms. Reitmeier's recommendation, at which

time Mr. Walters reviewed the qualifications of Mr. Geller and the recommendations of his staff

and selected Mr. Geller for the position of Project Manager in the NYCHA Collaboration

Program.  Id.

187.    Mr. Geller was the best candidate for the job because he had the skills and

experience the division sought in the successful candidate, but also brought a keen knowledge of

real estate finance including underwriting, tax credit financing and financial modeling, strong

interpersonal skills as well as excellent writing and computer skills.  Id. at ¶ 5;  see also A copy

of Mr. Geller's resume which is annexed to the Carberry Decl. as Exhibit "JJJ."  In addition, Mr.

Geller earned a Master's degree in Urban Planning from Columbia University and was regarded

as an intelligent and smart individual who would come in and take the initiative needed to

organize and implement the necessary mechanisms.  See id. ; see also Walters Decl. at ¶ 5.

188.    In contrast, Mr. Geller was never directly compared with the plaintiff because Mr.

Walters' division did not receive plaintiff's resume until July 19, 2006, two days after the

posting period expired.  Id. at ¶ 6.  Due to the timing of the receipt of plaintiff's resume, and the

large number of potentially qualified applicants already under consideration, the plaintiff was not

interviewed or considered for this position.  Id.  However, upon review of plaintiff's resume, Mr.

Walters explained that plaintiff's resume does not evidence the financing and underwriting

knowledge that was sought.  Id.; see also A copy of plaintiff's resume, annexed to the Carberry

Decl., as Exhibit "C."

189.    At no time in the selection process, did race, national origin or age of the

prospective candidates play any role in Mr. Walters' decision making process.  See Walters

Decl. at ¶ 7.  In fact, Mr. Walters is a black male and was forty-four years old when he made the

decision to hire Mr. Geller.  Id.

Dated:          New York, New York
                September 19, 2008

                                **MICHAEL A. CARDOZO**
                                Corporation Counsel of the
                                  City of New York
                                Attorney for Defendant
                                100 Church Street, Room 2-300
                                New York, New York 10007
                                (212) 788-0924


                                By:  _____/s/_____
                                     Andrez Carberry (AC 4267)
                                     Assistant Corporation Counsel